Volume 1 of 2

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARY DOE,
              *Plaintiff-Appellant,*

              v.

ARTHUR MANN, in his official
capacity; ROBERT L. CRONE, JR., in
his official capacity; LAKE COUNTY
SUPERIOR COURT; DEPARTMENT OF
SOCIAL SERVICES, LAKE COUNTY;
D., Mrs.; D., Mr.,
              *Defendants-Appellees.*

No. 04-15477

D.C. No.
CV-02-03448-MHP

OPINION

Appeal from the United States District Court
for the Northern District of California
Marilyn H. Patel, District Judge, Presiding

Argued and Submitted
October 6, 2004—San Francisco, California

Filed July 19, 2005

Before: Stephen S. Trott, M. Margaret McKeown,
Circuit Judges, and Milton I. Shadur, Senior District Judge.*

Opinion by Judge McKeown

---

*The Honorable Milton I. Shadur, United States Senior District Judge
for the Northern District of Illinois, sitting by designation.

**COUNSEL**

Jeffrey L. Bleich, Munger, Tolles & Olson, San Francisco, California, for the plaintiff-appellant.

Marc A. Le Forestier, Deputy Attorney General, State of California, Sacramento, California; Robert L. Weiss, Deputy County Counsel, Lake County, Lakeport, California, for the defendants-appellees.

Caroline J. Todd, Berkeley, California, for intervenor-appellee Jane Doe.

Bertram E. Hirsch, Great Neck, New York, for amici Association on American Indian Affairs, National Indian Child Welfare Association, and Tanana Chiefs Conference.

Thomas Weathers, Alexander, Berkey, Williams & Weathers, Berkley, California, for amicus Morongo Band of Mission Indians.

Brad S. Jolly, Smith & Jolly, Thornton, Colorado, for amicus Elem Indian Colony.

John W. Corbett, Klamath, California, for amicus Yurok Tribe.

**OPINION**

McKEOWN, Circuit Judge:

Mary Doe[1] challenges the State of California's jurisdiction

---

[1]Pseudonyms are used to identify the mother, child, and adoptive parents.

to terminate her parental rights over her Indian child, Jane Doe, who was domiciled on the Elem Indian Colony reservation at the time she was removed from Mary Doe's custody by the Lake County Department of Social Services. The case arises under the Indian Child Welfare Act ("ICWA"), which was passed in 1978 to ensure the tribes a role in adjudicating child custody proceedings involving Indian children. P.L. 95-608, codified at 25 U.S.C. §§ 1901-1963.[2] ICWA provides that tribes will have exclusive jurisdiction over child custody proceedings involving Indian children domiciled or residing on the reservation "except where such jurisdiction is otherwise vested in the State by *existing Federal law*." 25 U.S.C. § 1911(a) (emphasis added). Under one such federal law, 18 U.S.C. § 1162(a) and 28 U.S.C. § 1360(a), commonly known as "Public Law 280," California is vested with broad criminal and certain civil jurisdiction over Indians.

This case presents an issue of first impression for the federal courts, requiring us to reconcile Public Law 280's grant of certain jurisdiction to the state of California over Indians with the exclusive jurisdiction granted to tribes by ICWA over child custody proceedings involving Indian children domiciled on Indian reservations.

As a threshold matter, we conclude that the federal court has jurisdiction under 28 U.S.C. § 1331 and, in conjunction with ICWA, may use that jurisdiction to review the state court judgment terminating Mary Doe's parental rights; the *Rooker-Feldman* doctrine did not bar the district court from exercising jurisdiction. On the merits, we conclude that ICWA does not provide the Elem Indian Colony with exclusive jurisdiction over this child dependency proceeding involving Jane Doe, an Indian child. Consequently, we affirm the district court's entry of judgment in favor of the State of California.

---

[2]All references to the U.S. Code are to Title 25 unless otherwise indicated.

## I. Factual and Procedural Background

Mary Doe is a member of the federally recognized Elem Indian Colony in Lake County, California.[3] In 1999, Jane told her mother that a minor male cousin had sexually assaulted her. Mary Doe called the Department of Social Services, and the agency responded by removing Jane from her great-aunt's home on the Elem Indian Colony's reservation, where Jane was residing at the time.

The Department of Social Services initiated child dependency proceedings in Lake County Superior Court under California's Welfare and Institutions Code ("Cal. Welf. & Inst. Code") §§ 300(b) and (d) based on Mary Doe's failure to protect her daughter. Jane was placed in a licensed foster home while the state dependency proceedings were pending in state superior court. In the fall of 2000, the Elem Indian Colony intervened in the superior court proceedings. At the same time, the Tribal Council passed a resolution declaring that Jane should be placed for adoption with Mary Doe's brother and her sister-in-law.

The superior court terminated Mary Doe's parental rights in 2001. Jane's foster parents, Mr. and Mrs. D, petitioned to adopt her. Mrs. D is an Indian but not a member of the Elem Indian Colony. Despite the Elem Indian Colony's resolution, the superior court approved the adoption by Mr. and Mrs. D. The petition for adoption stated that Jane was an Indian child under ICWA and was affiliated with the Elem Indian Colony.

---

[3]Mary Doe submitted a motion to strike portions of the Supplemental Excerpts of Record because most of the documents were state court records that were not included in the district court record. The motion to strike is granted. *See* Fed. R. App. P. 10(a)(1); 9th Cir. R. 10-2(b). We do, however, take judicial notice of the following records from the state court proceedings: 1) Orders Under Section 366.26 of the Welfare and Institutions Code, which establish that Mary Doe's parental rights were terminated on February 16, 2001; 2) Petition for Adoption; 3) Attachment to Petition for Adoption — Adoption of an Indian Child; 4) Order of Adoption; and 5) Juvenile Dependency Petition.

A year and a half after her parental rights were terminated, Mary Doe filed a complaint in federal court for declaratory and injunctive relief. Among other claims, Mary Doe challenged the superior court's jurisdiction to terminate her parental rights and to approve Jane's adoption by Mr. and Mrs. D. Mary Doe named as defendants two Superior Court Judges and the Superior Court (collectively "Court-Appellees"), Mr. and Mrs. D, and the Department of Social Services.

The district court held that the *Rooker-Feldman* doctrine did not bar it from exercising subject matter jurisdiction over Mary Doe's complaint because § 1914 provides a cause of action in federal court to invalidate certain state court child custody proceedings. *Doe v. Mann*, 285 F. Supp. 2d 1229, 1233-34 (N.D. Cal. 2003). Applying its jurisdiction, the district court held that, because the Elem Indian Colony did not have exclusive jurisdiction over child dependency proceedings under § 1911(a), the superior court had jurisdiction to terminate Mary Doe's parental rights and approve Jane's adoption. *Id.* at 1238-39. The district court entered a final judgment against Mary Doe, thus leaving intact the state court parental termination and adoption orders.

## II.  JURISDICTION

Mary Doe's district court complaint asserted that the state judges and "the Superior Court erroneously deprived [Mary Doe] of custody of [Jane] without jurisdiction." Invoking § 1914,[4] which provides that a parent "may petition any court

---

[4]Section 1914, codified at 25 U.S.C. § 1914, provides:

Any Indian child who is the subject of any action for foster care placement or termination of parental rights under State law, any parent or Indian custodian from whose custody such child was removed, and the Indian child's tribe may petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated any provision of sections 101, 102, and 103 of this Act [25 U.S.C. §§ 1911, 1912, and 1913].

of competent jurisdiction to invalidate" a parental rights termination order, Mary Doe sought a declaration that the state court judgments terminating Mary Doe's parental rights and approving the adoption of Jane were null and void for lack of jurisdiction under ICWA. Mary Doe contended that § 1911(a) provides the Elem Indian Colony exclusive jurisdiction over Jane's dependency proceedings because Jane was domiciled within Indian country at the time dependency proceedings commenced.

Typically, the *Rooker-Feldman* doctrine bars federal courts from exercising subject-matter jurisdiction over a proceeding in "which a party losing in state court" seeks "what in substance would be appellate review of the state judgment in a United States district court, based on the losing party's claim that the state judgment itself violates the loser's federal rights." *Johnson v. De Grandy*, 512 U.S. 997, 1005-06 (1994). The nature of Mary Doe's federal complaint falls squarely within the confines of a "de facto appeal" of a state court judgment that would be outside the subject-matter jurisdiction of the federal district court under the *Rooker-Feldman* doctrine. *See Noel v. Hall*, 341 F.3d 1148, 1156 (9th Cir. 2003) (federal district court must refuse to hear "a forbidden de facto appeal from a judicial decision of a state court"). We ultimately conclude, however, that the federal district court had jurisdiction to consider Mary Doe's complaint because the federal district court had federal question jurisdiction over Mary Doe's claims, and § 1914 grants federal district courts the authority to invalidate state court actions that violate §§ 1911, 1912, and 1913.

## A. *Rooker-Feldman* Doctrine

**[1]** The *Rooker-Feldman* doctrine derives its name from two Supreme Court cases: *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983). In simple terms, "[u]nder *Rooker-Feldman*, a federal district court is without subject

matter jurisdiction to hear an appeal from the judgment of a
state court." *Bianchi v. Rylaarsdam*, 334 F.3d 895, 896 (9th
Cir. 2003).

The Supreme Court has applied the doctrine only three
times, in the named cases and, just this year, in *Exxon Mobil
Corp. v. Saudi Basic Industries Corp.*, where it emphasized
the narrow scope of the doctrine:

> The *Rooker-Feldman* doctrine . . . is confined to
> cases of the kind from which the doctrine acquired
> its name: cases brought by state-court losers com-
> plaining of injuries caused by state-court judgments
> rendered before the district court proceedings com-
> menced and inviting district court review and rejec-
> tion of those judgments. *Rooker-Feldman* does not
> otherwise override or supplant preclusion doctrine or
> augment the circumscribed doctrines that allow fed-
> eral courts to stay or dismiss proceedings in defer-
> ence to state-court activities.

125 S. Ct. 1517, 1521-22 (2005).[5] Our earlier precedent is
consistent. As we explained in *Noel v. Hall*,

> [a] federal district court dealing with a suit that is, in
> part, a forbidden de facto appeal from a judicial deci-
> sion of a state court must refuse to hear the forbidden
> appeal. As part of that refusal, it must also refuse to
> decide any issue raised in the suit that is "inextrica-
> bly intertwined" with an issue resolved by the state
> court in its judicial decision.

---

[5]We note that the Court-Appellees did not raise preclusion principles on
appeal, and the Department of Social Services raised preclusion principles
in only one sentence of its brief. As a result, we leave for another case the
relationship between § 1914 and the Full Faith and Credit Act, 28 U.S.C.
§ 1738, and the principles of res judicata and collateral estoppel.

341 F.3d at 1158.

Mary Doe first tries to sidestep *Rooker-Feldman* on the theory that state court jurisdiction under § 1911(a) was not raised and litigated in Lake County Superior Court, thus preventing Mary Doe's federal complaint from being characterized as a de facto appeal. Rather than ask the federal district court to reconsider the substance of the state court orders to terminate Mary Doe's parental rights and approve the adoption of Jane, Mary Doe contends the complaint presents a new jurisdictional issue. We are not persuaded.

**[2]** Although the ICWA jurisdictional issue was not raised in the state court proceedings, Mary Doe's federal claim is still a de facto appeal of a state court judgment, and the jurisdictional issue raised by Mary Doe is inextricably intertwined with the state court's judgment. *See Noel*, 341 F.3d at 1158. Indeed, while not explicitly addressed in the state court's rulings terminating Mary Doe's parental rights and approving Jane's adoption, the state court necessarily must have concluded it had jurisdiction pursuant to ICWA and Public Law 280 to make those decisions.[6] Thus, the fact that Mary Doe now challenges the state court's jurisdiction under ICWA does not change our initial *Rooker-Feldman* calculus. Mary Doe requests that we "undo" a prior state court judgment, which is another way of presenting a federal district court

---

[6]*Rooker-Feldman* applies where the plaintiff in federal court claims that the state court did not have jurisdiction to render a judgment. *See Olson Farms, Inc. v. Barbosa*, 134 F.3d 933, 936 (9th Cir. 1998) (*Rooker-Feldman* bars subject-matter jurisdiction over federal claim challenging determinations of the California Agricultural Labor Relations Board and California state courts that they had jurisdiction over Olson Farms under the California Agricultural Labor Relations Act); *MacKay v. Pfeil*, 827 F.2d 540, 545 (9th Cir. 1987) (*Rooker-Feldman* bars subject-matter jurisdiction over federal claim that Alaska Superior Court wrongly found it had personal jurisdiction over plaintiff); *Schmitt v. Schmitt*, 324 F.3d 484, 487 (7th Cir. 2003) (*Rooker-Feldman* bars subject-matter jurisdiction over federal claim that state court lacked personal jurisdiction).

with a de facto appeal that bars subject-matter jurisdiction under the *Rooker-Feldman* doctrine. *See Bianchi*, 334 F.3d at 900 ("Stated plainly, '*Rooker-Feldman* bars any suit that seeks to disrupt or 'undo' a prior state-court judgment, regardless of whether the state-court proceeding afforded the federal-court plaintiff a full and fair opportunity to litigate her claims.' ") (citations omitted).

Our conclusion that Mary Doe's case falls within the traditional boundaries of the *Rooker-Feldman* doctrine is but one piece of the jurisdictional puzzle. We next consider whether Congress, in enacting ICWA, provided federal courts authority to invalidate state court actions in the narrow area of child custody proceedings involving Indian children. If so, *Rooker-Feldman* would not preclude federal jurisdiction. Before turning to ICWA, we consider other circumstances in which Congress authorized federal courts to review state court judgments.

### B.   Congressional Grants of Authority to Review State Court Judgments

**[3]** The Constitution does not command the *Rooker-Feldman* doctrine. *In re Gruntz*, 202 F.3d 1074, 1078 (9th Cir. 2000) (en banc) ("*Rooker-Feldman* is not a constitutional doctrine. Rather, the doctrine arises out of a pair of negative inferences drawn from two statutes. . . . ."). As a result, Congress may authorize federal district courts to review state court judgments. *Id.* at 1079 (*Rooker-Feldman* must be considered in the context of "the entire federal jurisdictional constellation," including congressional grants of authority to review state-court decisions in certain cases). Federal statutes that permit federal courts to review state court judgments are rare but obvious.[7] Two examples, habeas corpus and bank-

---

[7]Courts have been loath to recognize statutory authorizations to review state court judgments. *See, e.g.*, *Dale v. Moore*, 121 F.3d 624, 627 (11th Cir. 1997) (holding the Americans With Disabilities Act "does not provide

ruptcy jurisdiction, are often referred to as "exceptions" to *Rooker-Feldman*. As we explained in *Noel*,

> the principle that there should be no appellate review of state court judgments by federal trial courts has two particularly notable statutory exceptions: First, a federal district court has original jurisdiction to entertain petitions for habeas corpus brought by state prisoners who claim that the state court has made an error of federal law. Second, a federal bankruptcy court has original jurisdiction under which it is empowered to avoid state judgments, to modify them, and to discharge them.

341 F.3d at 1155 (internal citations and quotations omitted). In both instances, the statutes reflect clear congressional grants of authority.

Another useful example of an explicit grant of authority for federal courts to invalidate state court judgments is the implementing legislation of the Hague Convention. The statute, the International Child Abduction Remedies Act ("ICARA"), provides that state and federal courts have concurrent original

---

an independent source of federal court jurisdiction that overrides the application of the *Rooker-Feldman* doctrine" even though the ADA subjects state public entities to the terms of the act); *Ritter v. Ross*, 992 F.2d 750, 753, 755 (7th Cir. 1993) (applying *Rooker-Feldman* to bar § 1983 suit claiming state foreclosure proceeding was a deprivation of property without due process, but noting that *Rooker-Feldman* " 'simply forbids federal district court appellate review of state court judgments in the guise of collateral attacks when no federal statute authorizes such review' " (quoting James S. Liebman, *Apocalypse Next Time?: The Anachronistic Attack on Habeas Corpus/Direct Review Parity*, 92 Colum. L. Rev. 1997, 2008 n.46 (1992)); *Johnson v. Kansas*, 888 F. Supp. 1073, 1080 (D. Kan. 1995), *aff'd*, 1996 U.S. App. LEXIS 6598 (10th Cir. 1996) ("The only exception to . . . the *Rooker-Feldman* doctrine, is where a federal statute authorizes federal appellate review of final state court decisions.") (alteration in original) (internal quotations and citations omitted).

jurisdiction over actions arising under the Hague Convention. 42 U.S.C. § 11603(a). We have interpreted this provision of ICARA to provide federal district courts the authority to vacate state custodial decrees that violate the Hague Convention:

> In this case, Congress has expressly granted the federal courts jurisdiction to vindicate rights arising under the Convention. *See* 42 U.S.C. § 11603(a). Thus, federal courts must have the power to vacate state custody determinations and other state court orders that contravene the treaty.

*Mozes v. Mozes*, 239 F.3d 1067, 1085 n.55 (9th Cir. 2001).

[4] Whether characterized as exceptions to *Rooker-Feldman* or as specific grants of authority, these three examples underscore that Congress may by statute grant federal courts authority to review certain state court judgments.

## C. ICWA § 1914—Authority to Invalidate State Court Actions

[5] The question we now consider is whether § 1914 is a grant of authority to the federal courts to invalidate certain state court child custody proceedings that counteracts the *Rooker-Feldman* doctrine. Section 1914 provides:

> Any Indian child who is the subject of any action for foster care placement or termination of parental rights under State law, any parent or Indian custodian from whose custody such child was removed, and the Indian child's tribe *may petition any court of competent jurisdiction to invalidate such action* upon a showing that such action violated any provision of sections 101, 102, and 103 of this Act [25 U.S.C. §§ 1911, 1912, and 1913].

25 U.S.C. § 1914 (emphasis added). Federal cases that have interpreted § 1914 are few and far between, and no case has analyzed § 1914 in the jurisdictional context or in relation to the *Rooker-Feldman* doctrine.[8]

The district court held, by a process of elimination, that § 1914 granted it authority to review the state court judgment:

> [B]y a process of elimination, a "court of competent jurisdiction" must include inferior federal courts, or the provision is meaningless. If the section only referred to state appellate courts, there would be no need for Congress to create this cause of action; Doe already has the right to appeal an adverse decision to California's higher courts. It is highly unlikely that the provision grants tribal courts the power to invalidate state court judgments.
>
> . . . .

---

[8]Court-Appellees argue that *Confederated Tribes of the Colville Reservation v. Superior Court*, 945 F.2d 1138 (9th Cir. 1991), demonstrates that § 1914 does not provide an exception to *Rooker-Feldman*. This case is not germane to our inquiry, however, because it involved a parent-to-parent custody dispute that was not covered under ICWA. *Id.* at 1140 n.3. ("As the district court made clear, the question of the Tribes' exclusive jurisdiction under the ICWA became a 'non-issue.' "). Although the Tenth Circuit has construed § 1914 in the context of res judicata, collateral estoppel, declaratory judgment actions, and *Younger* abstention, none of the cases considered *Rooker-Feldman* principles in conjunction with challenges to compliance with ICWA. *See Kiowa Tribe of Okla. v. Lewis*, 777 F.2d 587, 590 (10th Cir. 1985) (res judicata prevented the tribe from relitigating claims in federal court where the state court denied the tribe the right to intervene in child custody proceeding); *Morrow v. Winslow*, 94 F.3d 1386, 1390 (10th Cir. 1996) (no consideration of *Rooker-Feldman* in the context of § 1914 because *Younger* abstention prevented an injunction of ongoing state custody proceeding); *Comanche Indian Tribe of Okla. v. Hovis*, 53 F.3d 298, 304 (10th Cir. 1995) (collateral estoppel prevented the tribe from seeking declaratory judgment as to its jurisdiction under § 1911(a)).

This court finds that section 1914 grants federal courts the power to review state custody proceedings such as those here; therefore, the Rooker-Feldman doctrine does not apply to the action at bar.

285 F. Supp. 2d at 1233-34. We reach the same conclusion, but via a different path.

On its face, the statutory language is clear and very broad: "*any* court of competent jurisdiction" may invalidate a state court action. 25 U.S.C. § 1914 (emphasis added). Certainly the federal court easily fits within the broad "any court" language, but we must determine whether the statute confers jurisdiction upon the federal courts.

At the outset, it is important to note that despite broad language, § 1914 is not a statute that itself confers jurisdiction. In an analogous situation involving the Administrative Procedure Act, the Supreme Court reasoned that 5 U.S.C. § 703's reference to a "court of competent jurisdiction" was not a grant of subject-matter jurisdiction:

> Title 5 U.S.C. § 702 makes clear that a person wronged by agency action "is entitled to judicial review thereof." But § 703 suggests that this language was not intended as an independent jurisdictional foundation, since such judicial review is to proceed "in a court specified by statute" or "in a court of competent jurisdiction." Both of these clauses seem to look to outside sources of jurisdictional authority. Thus, at best, the text of [§§ 702 and 703] is ambiguous in providing a separate grant of subject-matter jurisdiction.

*Califano v. Sanders*, 430 U.S. 99, 106 n.6 (1977).[9]

---

[9]*See also Indus. Indem., Inc. v. Landrieu*, 615 F.2d 644, 646-47 (5th Cir. 1980) (provision in National Housing Act that the "Secretary shall . . . be authorized . . . to sue and be sued in any court of competent jurisdiction" was a waiver of sovereign immunity only, and the district court's subject matter jurisdiction came from 28 U.S.C. § 1331).

Applying *Califano*, we conclude that § 1914's reference to "any court of competent jurisdiction" alone does not create subject-matter jurisdiction in the federal district court sufficient to review and vacate state custody decrees. Consequently, we must determine whether the federal district court had jurisdiction from an independent source, 28 U.S.C. § 1331, making it a "court of competent jurisdiction" that is authorized by § 1914 to invalidate certain state court child custody proceedings.

**[6]** More than a decade ago, we resolved that ICWA creates an implied cause of action and thus serves as a basis for federal question jurisdiction under 28 U.S.C. § 1331. In *Native Village of Venetie v. Alaska*, 944 F.2d 548 (9th Cir. 1991) ("Native Village of Venetie I"), we concluded that Congress intended to create a federal private right of action in tribes and individuals to seek a determination of their ICWA rights and obligations in federal district court under ICWA's full faith and credit clause in § 1911(d):

> [W]e see no reason that Congress would not have intended to give Indian tribes access to federal courts to determine their rights and obligations under the Indian Child Welfare Act. The Act includes an express congressional finding that state courts and agencies have often acted contrary to the interests of Indian tribes.
>
> . . . .
>
> It would thus be ironic indeed if Congress then permitted only state courts, never believed by Congress to be the historical defenders of tribal interests, to determine the scope of tribal authority under the Act.
>
> . . . .
>
> Without a cause of action under the Indian Child Welfare Act, [the individual tribal members] would

be essentially left without a remedy. We cannot conceive that Congress intended such a self-defeating result.

*Id.* at 553-54.

We reaffirmed our holding when the case returned to the Ninth Circuit:

> In considering our jurisdiction in [Native Village of Venetie I], we held that § 1911(d) of the ICWA gave both the Native villages and their individual residents private rights of action in federal court. We reasoned that, given Congress's understanding at the time of passage that statutes passed for the benefit of Indian tribes would "be liberally construed in favor of such tribes," Congress would have expressly precluded a federal cause of action had it intended that none be recognized. After finding "no reason that Congress would not have intended to give Indian tribes access to federal courts to determine their rights and obligations under the Indian Child Welfare Act," the court held that "Congress's intention to create a tribal cause of action under the Act can be inferred."

*Native Village of Venetie v. Alaska*, 155 F.3d 1150, 1152 (9th Cir. 1998) (internal citations omitted) ("Native Village of Venetie II").[10]

[7] The Indian canons of construction were critical to our reasoning:

---

[10]It bears noting that the *Native Village of Venetie* cases did not involve an effort to invalidate a state court judgment, but rather, involved an effort to force state executive agencies to recognize tribal adoption decrees. This posture, however, does not alter our reliance on the holding in the *Native Village of Venetie* cases that ICWA creates a federal private right of action over which district courts have federal-question jurisdiction.

Congress's intention to create a tribal cause of action under the [ICWA] can be inferred from Congress's understanding of the law at the time the Act was enacted. The intention of Congress can be gleaned, at least in part, by reference to prior law, as Congress is presumed to be knowledgeable about existing law pertinent to any new legislation. Thus, Congress can be presumed to know that statutes passed for the benefit of Indian tribes will be liberally construed in favor of such tribes. Congress can also be presumed to know that the federal courts routinely resolve questions of tribal sovereignty as they are implicated by various acts of Congress. If Congress did not seek to have such principles applied to the interpretation of the Indian Child Welfare Act, we presume that it would have said so. Thus, we must conclude that the villages may seek determination of their rights under the Act in federal court.

As to [the individual tribal members'] individual causes of action under the Indian Child Welfare Act, the same reasoning applies.

*Native Village of Venetie I*, 944 F.2d at 554 (internal citations omitted). The rationale in *Native Village of Venetie I* that § 1911(d) included an implied federal private right of action equally supports recognizing an implied federal private right of action in § 1911(a) for tribes and individuals to seek federal district court determination of the tribe's jurisdiction over child custody proceedings involving Indian children domiciled on the reservation.

[8] Having resolved that the federal district court is a "court of competent jurisdiction" under § 1914, we turn to the remainder of the statute. Section 1914 provides that the Indian child, the parent or Indian custodian, or the tribe "may petition any court of competent jurisdiction to invalidate such action." 25 U.S.C. § 1914. The action referred to is a state-

court action for "foster care placement or termination of parental rights." *Id.* The language of the statute could not be clearer: Congress is authorizing any court of competent jurisdiction to invalidate a state court judgment involving the Indian child.[11] Having concluded that Congress created a federal cause of action over which the federal courts have subject matter jurisdiction under 28 U.S.C. § 1331, it requires no leap for us to conclude further that Congress explicitly authorized federal courts to invalidate state court judgments in this limited arena.

We recognize that the prudential concerns embodied by the *Rooker-Feldman* doctrine are important to our system of limited federal court jurisdiction and federalism. The *Rooker-Feldman* doctrine, however, will give way where Congress otherwise grants federal courts the authority to review state court judgments. Although Congress did not specifically identify *federal* courts in ICWA as the tribunals designated to review state judgments, in contrast to the habeas and bankruptcy statutes, here Congress went one step further and gave "any court of competent jurisdiction" the authority to "invalidate" certain state child custody proceedings.

**[9]** To the extent there is any uncertainty about the scope of federal authority to invalidate state court child custody proceedings, a proposition we do not embrace, one of the Indian canons of construction resolves the issue. It provides that federal courts will liberally construe a federal statute in favor of Indians, with ambiguous provisions interpreted for their benefit. *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985). The purpose of ICWA was to rectify state agency and

---

[11]Although not necessary to our analysis, we note that the legislative history is equally clear: "Section 104 [25 U.S.C. § 1914] authorizes the child, parent, or Indian custodian or the tribe to move to set aside any foster care placement or termination of parental rights on the grounds that the rights secured under [25 U.S.C. §§ 1911, 1912, or 1913] were violated." H.R. Rep. No. 95-1386, at 23 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7530, 7546.

court actions that resulted in the removal of Indian children from their Indian communities and heritage.[12] Resolving any ambiguity in favor of the Indians yields a conclusion that Indians have a forum in federal court to challenge state child custody decisions. We thus conclude that § 1914 provides the federal courts authority to invalidate a state court foster care placement or termination of parental rights if it is in violation of §§ 1911, 1912, or 1913.

## III. The Indian Child Welfare Act And Public Law 280 Jurisdiction

### A. Summary

Resolution of Mary Doe's case requires us to decide whether her tribe has exclusive jurisdiction in a child dependency proceeding. We begin with § 1911(a), which provides:

> An Indian tribe shall have jurisdiction exclusive as to any State over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation of such tribe, *except where such jurisdiction is otherwise vested in the State by existing Federal law*.

25 U.S.C. § 1911(a) (emphasis added). The "existing Federal law" proviso in § 1911(a) has been interpreted to include a federal law popularly referred to as "Public Law 280," which gives certain states, including California, broad jurisdiction over criminal offenses committed in Indian country, 18 U.S.C. § 1162(a), and limited jurisdiction over civil causes of action that arise in Indian country, 28 U.S.C. § 1360(a). *See*

---

[12]*See* 25 U.S.C. § 1901(5) ("Congress finds . . . that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families.").

*Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 42 n.16 (1989). No other "existing Federal law" is applicable here.

The first step is to determine whether the proceeding "involv[es] an Indian child who resides or is domiciled" on the reservation. 25 U.S.C. § 1911(a). Jane, who no one disputes is an Indian child, was domiciled on her reservation when the child dependency proceedings in this case commenced.

The next step is to determine whether the dependency proceeding at issue falls within the meaning of "any child custody proceeding." *Id.* Again, the statutory language provides an easy answer as "child custody proceeding" is defined to include "termination of parental rights," which means "any action resulting in the termination of the parent-child relationship," and "adoptive placement," which means "the permanent placement of an Indian child for adoption, including any action resulting in a final decree of adoption." 25 U.S.C. §§ 1903(1)(ii), (iv). These are precisely the actions taken in the proceedings at issue here.

**[10]** On its face, § 1911(a) poses little difficulty in interpretation. The wrinkle comes in interpreting Public Law 280, which is embedded within § 1911. Section 1911(a) provides in unambiguous terms that the tribe has *exclusive* jurisdiction over any child custody proceeding involving an Indian child residing or domiciled on the reservation *unless* jurisdiction is vested in a state under Public Law 280. Thus, we must decide whether Public Law 280 vested California with jurisdiction to terminate Mary Doe's parental rights and order the adoption of Jane.

The answer to that question lies in the interplay between California's child dependency law and Public Law 280. The California child dependency law, Cal. Welf. & Inst. Code § 300 et seq., permits the state to commence dependency proceedings in juvenile court, § 325, if a child's status falls

within various categories, including that the child suffered or is at substantial risk of physical harm, § 300(b), or the child has been or is at substantial risk of being sexually abused, § 300(d). The law permits the state, under certain circumstances, to petition for the termination of parental rights over a child previously judged to be a dependent of the juvenile court. Cal. Welf. & Inst. Code § 366.26.

**[11]** Determining whether the state had jurisdiction under Public Law 280 to enforce its child dependency law requires us to categorize the state dependency law as either criminal, civil regulatory, or civil adjudicatory. If the child dependency law embodies either a criminal offense under 18 U.S.C. § 1162(a) or a civil cause of action (civil adjudicatory) under 28 U.S.C. § 1360(a), then the tribe does not have exclusive jurisdiction under § 1911(a) and the state properly exercised jurisdiction. If, however, California's dependency law is a regulatory statute, then the tribe had exclusive jurisdiction and the parental rights determination is invalid. *See Bryan v. Itasca County*, 426 U.S. 373, 390 (1976) (Public Law 280 did not give the states "general civil regulatory powers" over tribes and their members in Indian country).

Mary Doe argues that California's dependency law falls into the civil regulatory category and thus outside the state's Public Law 280 jurisdiction. *See Bryan*, 426 U.S. at 390. She asks us to reach this conclusion by drawing a distinction between involuntary and voluntary custody proceedings. She maintains that involuntary child dependency proceedings are regulatory because they involve intervention by the state, through its sovereign authority, in a parent-child relationship. This type of proceeding, according to Mary Doe, contrasts with voluntary proceedings such as private adoptions, which involve only private parties and are not regulatory.

The Department of Social Services and Court-Appellees also stake their analysis on an interpretation of Public Law 280. In their view, the dependency statute falls under either

the criminal or the civil adjudicatory category, meaning that the tribe lacks exclusive jurisdiction. They argue that the voluntary/involuntary dichotomy is a false one and should not inform our analysis.

Although California's child dependency statute may not fit neatly into any of the Public Law 280 jurisdictional boxes, construing ICWA as a whole and considering child dependency proceedings in the context of both ICWA and Public Law 280, we conclude that the California statute does not fall within Public Law 280's criminal jurisdiction, but that it does fall within Public Law 280's civil adjudicatory jurisdiction. Embedded in this determination is the conclusion that the child dependency statute is not regulatory in nature. Thus, under ICWA, the tribe does not have exclusive jurisdiction over the child dependency proceeding because "jurisdiction is otherwise vested in the state [of California] by existing Federal law." 25 U.S.C. § 1911(a). Before delving into the application of Public Law 280, we take a detour to explain the contours of ICWA and Public Law 280, which provide the foundation for our analysis.

### B.  Background of ICWA

Congress passed ICWA in 1978 in response to a growing concern that Indian children were removed from their homes by state child protection officials at an alarmingly high rate and placed in foster care or adoption settings outside their Indian communities and culture. *See* 25 U.S.C. § 1901(4); *Holyfield*, 490 U.S. at 32. "At the heart of ICWA" lies a jurisdictional scheme aimed at ensuring that tribes have a role in adjudicating and participating in child custody proceedings involving Indian children domiciled both on and off the reservation. *Holyfield*, 490 U.S. at 36. This aim is reflected in § 1911(a)'s broad grant of exclusive jurisdiction to most tribes. 25 U.S.C. § 1911(a).

As we have explained, the "existing Federal law" proviso in § 1911(a), providing tribes with exclusive jurisdiction "ex-

cept where such jurisdiction is otherwise vested in the State by existing Federal law," is the crux of this case. Although the text of the proviso does not specifically identify Public Law 280, the legislative history surrounding the adoption of § 1911(a) and subsequent court decisions confirm that Congress was referring, at least in part, to Public Law 280. *See* H.R. Rep. No. 95-1386, at 32 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7530, 7554 (letter from Department of Interior); H.R. Rep. No. 95-1386, at 40, 1978 U.S.C.C.A.N. 7530, 7563 (letter from Department of Justice); *Holyfield*, 490 U.S. at 42 n.16; *Native Village of Venetie I*, 944 F.2d at 555.

An earlier draft of ICWA, House Resolution 12533, included a provision similar to § 1911(a) but did not refer to "existing" federal laws: "Sec. 101. (a) An Indian tribe shall have jurisdiction exclusive as to any State over any placement of an Indian child who resides on or is domiciled within the reservation of such tribe." Court-Appellees' Answer Brief at App. 22. During consideration of this earlier legislation, the Departments of Justice and Interior alerted Congress that this section could strip states of jurisdiction already existing where Public Law 280 applied. The Department of the Interior stated, "We believe that reservations located in States subject to Public Law 83-280 should be specifically excluded from section 101(a) . . . ."[13] The Department of Justice voiced similar concerns in two letters to Congress:

> As you may be aware, the courts have consistently recognized that tribal governments have exclusive jurisdiction over the domestic relationships of tribal members located on reservations, unless a State has assumed concurrent jurisdiction pursuant to Federal legislation such as Public Law 83-280 . . . . [S]ection 101(a) of the House draft, if read literally, would appear to displace any existing State court jurisdic-

---

[13]Letter from Forrest J. Gerard, Assistant Secretary of Interior, H.R. Rep. No. 95-1386, at 32, *reprinted in* 1978 U.S.C.C.A.N. 7530, 7554.

tion over these matters based on Public Law 83-280. We doubt that is the intent of the draft because, inter alia, there may not be in existence tribal courts to assume such State-court jurisdiction as would apparently be obliterated by this provision.[14]

After these letters were received, Congress amended the legislation to include the "existing Federal law" proviso that became law.

## C.    PUBLIC LAW 280

Twenty-five years prior to the passage of ICWA, Congress adopted Public Law 280, legislation that provides six "mandatory" states, including California,[15] with jurisdiction over criminal and some civil matters arising in Indian country.[16] The criminal jurisdiction conferred by Public Law 280 is expansive:

Each of the States or Territories listed . . . shall have

---

[14]Letters of Patricia M. Wald, Assistant Attorney General, H.R. Rep. No. 95-1386, at 35, 40, *reprinted in* 1978 U.S.C.C.A.N. 7530, 7558, 7563.

[15]The five other mandatory states are Alaska, Minnesota, Nebraska, Oregon, and Wisconsin. 18 U.S.C. § 1162(a); 28 U.S.C. § 1360(a). Alaska was added by amendment in 1958. *See Native Village of Venetie I*, 944 F.2d at 560. In a few of these states, specific reservations are exempted from the state's Public Law 280 jurisdiction, but all Indian country in California is subject to the state's criminal and civil Public Law 280 jurisdiction. *See* 18 U.S.C. § 1162(a), 28 U.S.C. § 1360(a).

[16]Until amended in 1968, Public Law 280 permitted states that were not designated as mandatory Public Law 280 states by the statute to assert similar jurisdiction over Indian country within state borders. *See Washington v. Confederated Bands and Tribes of the Yakima Indian Nation*, 439 U.S. 463, 471 n.9 (1979) (quoting original text of Public Law 280). Thus, for example, Washington, Idaho, Florida, and Iowa also asserted various degrees of Public Law 280 jurisdiction. These states are sometimes referred to as "non-mandatory" Public Law 280 states. After 1968, no additional states could assert jurisdiction under Public Law 280 without tribal consent.

jurisdiction over offenses committed by or against Indians in the areas of Indian country listed . . . to the same extent that such State or Territory has jurisdiction over offenses committed elsewhere within the State or Territory, and the criminal laws of such State or Territory shall have the same force and effect within such Indian country as they have elsewhere within the State or Territory . . . .

18 U.S.C. § 1162(a). The civil jurisdiction conferred by Public Law 280, on the other hand, is more circumscribed:

Each of the States listed . . . shall have jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country listed . . . to the same extent that such State has jurisdiction over other civil causes of action, and those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State . . . .

28 U.S.C. § 1360(a).

The legislative history of Public Law 280 reveals that Congress was motivated to confer criminal jurisdiction on the states due to "lawlessness" on Indian reservations:

In many States, tribes are not adequately organized to perform that function; consequently, there has been created a hiatus in law-enforcement authority that could best be remedied by conferring criminal jurisdiction on States indicating an ability and willingness to accept such responsibility.

S. Rep. No. 699 (1953), *reprinted in* 1953 U.S.C.C.A.N. 2409, 2411-12.

In contrast, the civil component of Public Law 280 was adopted with a "virtual absence of expression of congressional policy or intent." *Bryan*, 426 U.S. at 381. What little published legislative history exists provides only the following explanation for the civil jurisdiction:

> Similarly, the Indians of several States have reached a state of acculturation and development that makes desirable extension of State civil jurisdiction to the Indian country within their borders. Permitting the State courts to adjudicate civil controversies arising on Indian reservations, and to extend to those reservations the substantive civil laws of the respective States insofar as those laws are of general application to private persons or private property, is deemed desirable.

S. Rep. No. 699 (1953), *reprinted in* 1953 U.S.C.C.A.N. 2409, 2412. In *Bryan*, one of the seminal cases construing Public Law 280, the Court concluded that Congress intended to confer civil jurisdiction in Public Law 280 states to "redress the lack of adequate Indian forums for resolving private legal disputes between reservation Indians, and between Indians and other private citizens, by permitting the courts of the States to decide such disputes . . . ." 426 U.S. at 383. However, the Court emphasized that the legislative history included no indication of "an intention to confer general state civil regulatory control over Indian reservations." *Id.* at 384.

### D.   Public Law 280 and ICWA Precedent

The federal courts have interpreted ICWA on rare occasions, and while some courts have danced seductively close to the issue, none has ever directly addressed either Public Law 280 jurisdiction over child custody proceedings or whether there is a difference between voluntary and involuntary child custody proceedings in the context of Public Law

280. More specifically, no court has addressed the California child dependency statute.

The Supreme Court's only case interpreting ICWA, *Holyfield*, included a footnote that referenced the "existing Federal law" proviso in § 1911(a):

> Section 1911(a) does not apply "where such jurisdiction is otherwise vested in the State by existing Federal law." This proviso would appear to refer to Pub.L. 280, 67 Stat. 588, as amended, which allows States under certain conditions to assume civil and criminal jurisdiction on the reservations. Title 25 U.S.C. § 1918 permits a tribe in that situation to reassume jurisdiction over child custody proceedings upon petition to the Secretary of the Interior. The State of Mississippi has never asserted jurisdiction over the Choctaw Reservation under Public Law 280.

490 U.S. at 42 n.16. This passing reference does not resolve whether California's child dependency proceedings fall within the state's Public Law 280 criminal or civil jurisdiction. Not only is Mississippi not a Public Law 280 state, but the child custody proceeding at issue in *Holyfield* was a voluntary adoption initiated by the Indian parents of Indian twins. *Id.* at 37-38. *Holyfield* did not involve, as this case does, an involuntary termination of an Indian's parental rights.

Similar to the *Holyfield* footnote, the Ninth Circuit has made a broad, but ultimately non-dispositive, statement about the interplay between § 1911(a) and Public Law 280. *See Native Village of Venetie I*, 944 F.2d at 555 (noting that tribes in Public Law 280 states can invoke exclusive jurisdiction under § 1911 only after petitioning the Secretary of Interior). Like *Holyfield*, *Native Village of Venetie I* involved a voluntary, private adoption and the court limited its discussion of the expanse of Public Law 280's civil jurisdiction to private

adoption cases. *Id.* at 560 ("It is not disputed that *private adoption cases* are included within this transfer of civil jurisdiction [in Public Law 280] from the federal government to the states.") (emphasis added)).

States that have considered the interplay between Public Law 280 and a state's authority to enforce child dependency laws in Indian country have arrived at conflicting results. On one side, the Wisconsin Attorney General concluded that involuntary child custody proceedings lie outside Wisconsin's Public Law 280 jurisdiction because they "involve some aspect of the state's regulatory jurisdiction." 70 Op. Att'y Gen. Wis. 237 (1981), 1981 Wisc. AG LEXIS 7, *7, 18-20. The Attorney General contrasted voluntary proceedings, which are "not between the state and an individual, but rather primarily involve[ ] only private persons." *Id.* at *7. No other source has adopted this voluntary versus involuntary custody analysis.[17] In contrast, Washington and Idaho, two non-mandatory Public Law 280 states, have long identified child dependency proceedings as a subject matter within their Public Law 280 jurisdiction. *See Washington v. Confederated Bands and Tribes of the Yakima Indian Nation*, 439 U.S. 463, 465 n.1 (1979) (quoting Washington's 1963 law asserting Public Law 280 jurisdiction);[18] *State v. George*, 905 P.2d 626, 629 (Idaho 1995) (quoting Idaho's 1963 law asserting Public Law 280 jurisdiction).[19] [20]

---

[17]The Ninth Circuit cited the Wisconsin Attorney General's opinion favorably in *Native Village of Venetie I*, although for the separate proposition that Public Law 280 jurisdiction only provides states with "concurrent" jurisdiction over private adoption cases, not "exclusive" jurisdiction. *Native Village of Venetie I*, 944 F.2d at 561.

[18]Washington's Public Law 280 jurisdiction remains codified today at Wash. Rev. Code § 37.12.010 (2005) and includes "[d]omestic relations," "[a]doption proceedings," and "dependent children." *Id.* at §§ (3), (6) and (7).

[19]Idaho's Public Law 280 jurisdiction remains codified today at Idaho Code § 67-5101 (2004) and includes "Dependent, neglected and abused children." *Id.* at § C.

[20]Both states asserted jurisdiction over child dependency proceedings in

In sum, we navigate the question whether California properly exercised jurisdiction over Jane's dependency proceedings without much of a compass.

## IV. ICWA, PUBLIC LAW 280, AND THE CALIFORNIA DEPENDENCY REGIME

Given that no federal court has squarely addressed the question, we must break new ground in deciding whether California's child dependency proceedings are within California's Public Law 280 jurisdiction. Our analysis proceeds in two steps. First, is California's child dependency law criminal in nature? Second, if the child dependency law cannot be considered criminal, does enforcement of this law fall within the state's Public Law 280 civil adjudicatory jurisdiction, or is the state enforcing a "regulatory" law that is outside the state's jurisdiction under *Bryan*? Resolution of these questions must also be squared with an overall statutory analysis of ICWA, as Public Law 280 does not stand alone here but is integrated into the ICWA scheme.

### A.  PUBLIC LAW 280 CRIMINAL JURISDICTION

#### 1.  IDENTIFYING CRIMINAL/PROHIBITORY LAWS UNDER PUBLIC LAW 280

In *California v. Cabazon Band of Mission Indians*, the Supreme Court succinctly outlined the path to deconstructing Public Law 280:

> In *Bryan v. Itasca County*, we interpreted [28 U.S.C. § 1360(a)] to grant States jurisdiction over private

---

Indian country long before the Supreme Court issued its landmark Public Law 280 decisions in *Bryan* (1976) and *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), and before Congress enacted ICWA in 1978.

> civil litigation involving reservation Indians in state court, but not to grant general civil regulatory authority . . . . [Public Law 280] plainly was not intended to effect total assimilation of Indian tribes into mainstream American society. We recognized that a grant to States of general civil regulatory power over Indian reservations would result in the destruction of tribal institutions and values. Accordingly, when a State seeks to enforce a law within an Indian reservation under the authority of Pub.L. 280, it must be determined whether the law is criminal in nature, and thus fully applicable to the reservation under [18 U.S.C. § 1162(a)], or civil in nature, and applicable only as it may be relevant to private civil litigation in state court.

480 U.S. 202, 208 (1987) (internal citations omitted). The decision establishes three categories into which a state law may fall: criminal, regulatory, and civil law relevant to private litigation. *Id.*

In *Cabazon*, the Court applied this analytical framework by grappling with whether the State of California could enforce its penal code in Indian country for violation of the state's bingo laws. *Id.* at 205. The Court observed that state regulatory laws are often enforced with penal sanctions, making them appear "criminal" for Public Law 280 purposes, and thereby avoiding the regulatory classification that would prevent their enforcement under *Bryan*. *Id.* at 211 ("But that an otherwise regulatory law is enforceable by criminal as well as civil means does not necessarily convert it into a criminal law within the meaning of Pub.L. 280. Otherwise, the distinction between [Public Law 280's criminal jurisdiction and civil jurisdiction] could easily be avoided. . . ."). Under *Cabazon*, the label attached to the law in the state's statutory code is not the determinative factor for the purposes of classifying a law as either criminal or regulatory in nature. *Id.* Rather, the critical factor is whether the conduct at issue in the statute is gen-

erally prohibited by the state, or whether the conduct is generally permitted by the state but subject to regulation:

> [I]f the intent of a state law is generally to prohibit certain conduct, it falls within Pub.L. 280's grant of criminal jurisdiction, but if the state law generally permits the conduct at issue, subject to regulation, it must be classified as civil/regulatory and Pub.L. 280 does not authorize its enforcement on an Indian reservation.

*Id.* at 209.

The Court ultimately determined that the bingo laws were regulatory in nature, even though enforced with penal sanctions, because "California permits a substantial amount of gambling activity, including bingo, and actually promotes gambling through its state lottery," demonstrating that "California regulates rather than prohibits gambling in general and bingo in particular." *Id.* at 211. (Federal and state courts have applied the *Cabazon* criminal/prohibitory versus regulatory test with widely varying results, provoking some commentators to question whether the test is manageable in its current form.[21] The variation tends to result from how courts characterize the scope of the conduct at issue.[22]

---

[21]*See generally* Arthur F. Foerster, *Divisiveness and Delusion: Public Law 280 and the Evasive Criminal/Regulatory Distinction*, 46 UCLA L. Rev. 1333 (1999); Emma Garrison, *Baffling Distinctions Between Criminal and Regulatory: How Public Law 280 Allows Vague Notions of State Policy to Trump Tribal Sovereignty*, 8 J. Gender Race & Just. 449 (2004).

[22]*See State v. Stone*, 572 N.W.2d 725, 729 (Minn. 1997) ("[T]here has been a split of authority among courts across the country, including the Minnesota court of appeals, regarding the application of the *Cabazon* test. Those courts which have interpreted 'conduct' to refer to the broad activity have focused on this aspect without regard to the particularities of the narrow conduct. Those courts which have interpreted 'conduct' to refer to the narrow activity have focused primarily on whether the narrow conduct is categorically prohibited or whether the statute controlling the conduct contains exceptions.").

Some courts take a broad perspective by considering the conduct in the context of a larger permitted but regulated activity,[23] while other courts have focused on the narrow conduct specifically at issue in the case.[24]

Our decision in *Confederated Tribes of the Colville Reservation v. Washington*, 938 F.2d 146 (9th Cir. 1991), provides a concrete example of the difficulty of classifying a state law based on the specific conduct that is prohibited. In *Confederated Tribes of Colville*, we considered whether Washington state's traffic offense statutes, including its speeding laws, were prohibitory or regulatory in nature. *Id.* at 147. We concluded, relying on the broad line drawing in *Cabazon*, that *driving* was the conduct at issue, not *speeding*—even though

[23]*See Sycuan Band of Mission Indians v. Roache*, 54 F.3d 535, 539 (9th Cir. 1995) (considering conduct of gambling, not whether electronic machine gambling was prohibited in California, and concluding "the state cannot regulate and prohibit, alternately, game by game and device by device, turning its public policy off and on by minute degrees. *Cabazon Band* addressed the problem at a higher level of generality than that"); *Quechan Indian Tribe v. McMullen*, 984 F.2d 304, 307 (9th Cir. 1993) (concluding state fireworks laws were criminal/prohibitory because although fireworks could be sold eight days out of the year in California, the conduct was generally prohibited); *Twenty-Nine Palms Band of Mission Indians v. Wilson*, 925 F. Supp. 1470, 1477 (C.D. Cal. 1996) (professional boxing is a regulated subset of the generally permitted activity of boxing) (*vacated*, 156 F.3d 1239 (9th Cir. 1998)); *Seminole Tribe of Fla. v. Butterworth*, 658 F.2d 310 (5th Cir. 1981) (bingo is among types of gambling permitted but regulated by Florida); *State v. Stone*, 572 N.W.2d at 730-31 (laws prohibiting driving without proof of insurance, without a license, without a seatbelt, etc., are laws within larger context of permitted, but regulated, activity of driving).

[24]*St. Germaine v. Circuit Court*, 938 F.2d 75, 77 (7th Cir. 1991) (driving with a revoked license is prohibited by state law, and not simply considered part of regulated conduct of driving); *State v. Busse*, 644 N.W.2d 79, 84-85 (Minn. 2002) (driving after license was cancelled after four DUI convictions was prohibited by state law, and not simply considered part of regulated conduct of driving); *State v. Robinson*, 572 N.W.2d 720, 724 (Minn. 1997) (underage drinking is prohibited by state law, and not simply considered part of regulated conduct of alcohol consumption).

speeding was certainly a prohibited activity in Washington state. *Id.* at 148. Thus, because driving is a generally permitted but regulated activity, the state law was regulatory in nature and could not be enforced by state officers against Indians in Indian country:

> Laws which prohibit absolutely certain acts fall into the [criminal/prohibitory] category, while those generally permitting certain conduct but subject to regulation are within [the regulatory category]. . . . *Cabazon* focuses on whether the prohibited activity is a small subset or facet of a larger, permitted activity — high-stakes unregulated bingo compared to all bingo games — or whether all but a small subset of a basic activity is prohibited.

*Id.* at 147, 149.

The Supreme Court injected another wrinkle in the analysis when it held that the "shorthand test" for whether a law is prohibitory or regulatory is "whether the conduct at issue violates the State's public policy." *Cabazon*, 480 U.S. at 209. If the conduct at issue violates public policy, then the law is more likely criminal/prohibitory. *Id.* Significantly, the Ninth Circuit has held that permitting tribes rather than states to enforce a policy does not undermine state public policy. For instance, in *Confederated Tribes of Colville*, we acknowledged that tribal enforcement of its own traffic code in lieu of the state's speeding laws would not undermine the state's public policy:

> Thus, although the government is correct that *speeding* remains against the state's public policy, *Cabazon* teaches that this is the wrong inquiry. *Cabazon* focuses on whether the prohibited activity is a small subset or facet of a larger, permitted activity — high-stakes unregulated bingo compared to all bingo games — or whether all but a small subset of a basic activity is prohibited. Thus, in *United States v. Mar-*

*cyes*, 557 F.2d 1361, 1364 (9th Cir. 1977) we found . . . [t]o allow tribal members to operate fireworks stands on reservations would "entirely circumvent Washington's determination that the possession of fireworks is dangerous." *Marcyes*, 557 F.2d at 1364. *But to look to the Tribes rather than the state for traffic enforcement on the reservation will not detract from Washington's determination to discourage speeding.*

*Confederated Tribes of Colville*, 938 F.2d at 148-49 (emphasis added).

**Volume 2 of 2**

### 2. ANALYSIS OF THE CALIFORNIA CHILD DEPENDENCY STATUTE AS A CRIMINAL STATUTE

Although the Ninth Circuit and numerous other courts have applied the *Cabazon* test to state gaming, driving, fireworks, and boxing laws, to name just a few, reconciling the many distinctions and finding a common, consistent thread of analysis is neither an easy task nor a productive one. In particular, applying the criminal versus regulatory test to Mary Doe's case is unwieldy because it is problematic to compare a state's child dependency statutory scheme to a criminal prosecution or to state gaming laws. Overall, California's child dependency law and proceedings are aimed at promoting the best interests of the child, not at prohibiting conduct. As a result, the dependency proceedings do not fall within California's broad Public Law 280 criminal jurisdiction over Indians.

First and foremost, the statute does not prohibit specific conduct. Rather, the child dependency statute gives the state broad authority to remove children and terminate parental rights under specific circumstances. Granted, the state's authority under the statute is often triggered if a child is a victim or at substantial risk of harm, abuse, or neglect. Cal. Welf. & Inst. Code §§ 300(a), (b), (d), (e), (f), (j). Indeed, Jane was made a dependent of the juvenile court pursuant to §§ 300 (b) and (d) because her mother had failed to adequately supervise and protect her from physical harm and because Jane was the alleged victim of sexual abuse from which her mother failed to protect her.

But the statute is also triggered where abuse is not an issue, such as where the child is suffering from mental illness and the parents cannot address this special need. Cal. Welf. & Inst. Code § 300(c). Likewise, subsection (h) makes a child a dependent of the juvenile court if "[t]he child has been freed for adoption by one or both parents for 12 months by either relinquishment or termination of parental rights or an adoption petition has not been granted." Cal. Welf. & Inst. Code

§ 300(h). Both of these provisions demonstrate that abusive conduct or neglect is not necessarily a predicate to trigger California's child dependency statute.

While some of the circumstances that trigger the statute, such as child abuse, may constitute criminal violations under different parts of the California code, the statute itself does not require proof of a criminal violation nor does it prohibit such conduct.[25] Moreover, the statute provides that it is not designed to infringe on the permitted activity of parenting, suggesting that the state law regulates but a small facet of the generally permitted activity of parenting.[26]

It is also important to underscore that the statute is geared toward protecting the best interests of the child rather than controlling behavior. For that reason, our precedent that looks to categorization of the conduct at issue does not easily fit this statute. Of course, one could say that the statute regulates parenting, which is a permitted activity. Or one could argue that the statute prohibits abuse. But this framework is not particularly transferable because the well-being of the child, not conduct of the parent, is the focus of the statute and no specific conduct is prohibited.

---

[25]Unlike the Wisconsin civil statute at issue in *In re Burgess* that was found to be criminal for Public Law 280 purposes and permitted involuntary civil commitment of sexually violent people only if they had been convicted of a criminal offense, 665 N.W.2d 124, 132 (Wis. 2003), child dependency proceedings in California may be triggered regardless of whether the state pursues any criminal prosecution of a parent or a guardian for abuse or neglect.

[26]"It is the intent of the Legislature that nothing in this section disrupt the family unnecessarily or intrude inappropriately into family life, prohibit the use of reasonable methods of parental discipline, or prescribe a particular method of parenting. Further, nothing in this section is intended to limit the offering of voluntary services to those families in need of assistance but who do not come within the description of this section." Cal. Welf. & Inst. Code § 300.

Although the criminal versus civil inquiry is "one of the statute's intent and not simply its label," *Quechan Indian Tribe*, 984 F.2d at 307, the fact that California's child dependency statute is codified in the civil code is telling. More importantly, the California Supreme Court has affirmed that child dependency proceedings are civil in nature. *See In re Malinda S.*, 51 Cal. 3d 368, 384 (Cal. 1990) (quoting *In re Mary S.*, 186 Cal. App. 3d 414, 418 (Cal. Ct. App. 1986)).[27]

Just as significant, the proceedings are not punitive. "Dependency proceedings are civil in nature, designed not to prosecute the parent, but to protect the child." *In re Mary S.*, 186 Cal. App. 3d at 418; *see also In re Malinda S.*, 51 Cal. 3d at 384 (same); *Collins v. Superior Court*, 74 Cal. App. 3d 47, 52 (Cal. Ct. App. 1977) ("The purpose of these dependency proceedings is to protect and promote the welfare of the child, not to punish the parent.").

Consistent with the notion that the proceedings are neither criminal nor punitive, the procedural protections available in California's child dependency proceedings lie somewhere between criminal and civil in nature. *See Confederated Tribes of Colville*, 938 F.2d at 148 (considering procedural elements in assessing whether the state scheme was criminal or civil). Although indigent parents have a statutory right to counsel similar to that afforded criminal defendants, Cal. Welf. & Inst. Code § 317, the standard of proof required to remove a child from the parents' custody is "clear and convincing evi-

---

[27]"For many years, the courts characterized the nature of the dependency system inconsistently. Some viewed it as civil in nature. . . . Others viewed it as quasi-criminal in nature . . . . In 1990, however, the California Supreme Court described dependency proceedings as civil in nature, designed not to punish the parent but to protect the child . . . . While they may be civil in nature, these proceedings are significantly different from ordinary civil actions by reason of the way they affect the fundamental rights of parents and children." Gary C. Seiser & Kurt Kumli, *California Juvenile Courts Practice and Procedure* § 2.10[2] (2004).

dence," § 361(c),[28] something more akin to the civil standard of preponderance of the evidence than to the criminal standard of beyond a reasonable doubt. Many other procedural protections associated with criminal proceedings are likewise unavailable:

> A parent at a dependency hearing cannot assert the Fourth Amendment exclusionary rule, since 'the potential harm to children in allowing them to remain in an unhealthy environment outweighs any deterrent effect which would result from suppressing evidence' unlawfully seized. Nor can the parent seek reversal on the grounds of incompetency of counsel.

*In re Malinda S.*, 51 Cal. 3d at 384-85 (quoting *In re Mary S.*, 186 Cal. App. 3d at 418-19); *see also Lois R. v. Superior Court*, 19 Cal. App. 3d 895, 900 (Cal. Ct. App. 1971) ("[D]ependency proceedings are civil and have been conducted without strict adherence to all the formalities of a criminal trial.").

[12] Finally, we address *Cabazon*'s "shorthand test" for whether a law is prohibitory or regulatory, that is "whether the conduct at issue violates the State's public policy." 480 U.S. at 209. California's public policy "to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm," Cal. Welf. & Inst. Code § 300.2, is not undermined simply because the law is not classified as criminal in nature. As in *Confederated Tribes of Colville*, "look[ing] to the Tribes rather than the state" for protection of children

---

[28]In ICWA cases, state courts can terminate parental rights only when the determination is proven beyond a reasonable doubt. 25 U.S.C. § 1912(f). This provision does not alter our analysis of whether California's child dependency statute is criminal for Public Law 280 purposes.

against abuse and neglect does not violate the state's public policy. *See* 938 F.2d at 149. Taken as a whole and considering the multiple factors used for analyzing whether a law is criminal/prohibitory, we conclude that the California child dependency statute is not prohibitory. Therefore, California may not enforce its involuntary child dependency statute in Indian country through its criminal Public Law 280 jurisdiction.

## B.   Public Law 280 Civil Jurisdiction

We next consider whether the child dependency law falls within Public Law 280's civil adjudicatory jurisdiction or whether it is analogous to a regulatory statute. *Bryan*, 426 U.S. at 390. This distinction may be easy to state but, as noted in the *American Indian Law Deskbook*, the application is quite onerous.[29]

[13] California may assert its Public Law 280 civil jurisdiction over cases that are "civil causes of action between Indians or to which Indians are parties" and that involve "those civil laws . . . that are of general application to private persons or private property." 28 U.S.C. § 1360(a). The plain language of Public Law 280's civil jurisdictional provision suggests that California's enforcement of its child dependency law falls within the state's Public Law 280 civil jurisdiction. The state proceedings involved a civil cause of action to which Mary Doe and her child, both Indians, were parties. In addition, California's child dependency law is of "general application to private persons" in the state of California.

While it is tempting to rest on this plain reading of the stat-

---

[29]"The distinction between state civil laws that may supply a rule of decision and state regulatory laws that cannot be enforced by virtue of Public Law 280 civil jurisdiction is hardly clear and has caused difficulty in application." *American Indian Law Deskbook* 219-20 (Hardy Myers & Clay Smith eds., 3d ed. 2004).

ute, the Supreme Court's language in *Bryan* and *Cabazon* gives us pause: those two cases intimate that Public Law 280's civil jurisdiction is limited to disputes between *private* parties, which begs the question whether when, as here, the state is one of the parties, a proceeding falls within Public Law 280's civil jurisdiction. In *Bryan*, the Supreme Court described the civil component of Public Law 280 as "primarily intended to redress the lack of adequate Indian forums for resolving *private legal disputes between reservation Indians, and between Indians and other private citizens. . . .*" *Bryan*, 426 U.S. at 383 (emphasis added).

In *Cabazon*, the Court reiterated its holding that Public Law 280 granted to states civil jurisdiction only over private disputes. 480 U.S. at 208. We later characterized a Public Law 280 state's "very limited" civil jurisdiction provision as "essentially [affording] Indians a forum to settle *private disputes among themselves.*" *Confederated Tribes of Colville*, 938 F.2d at 147 (emphasis added). Throughout these cases, the theme is that the private nature of disputes is what places them within Public Law 280's civil jurisdiction.

We are confident, however, that resting our analysis simply on the Supreme Court's references to private disputes would create a tortured result that is at odds with the overall structure of ICWA, as well as with the history of Public Law 280 and California child dependency proceedings.

To begin, the genesis of the Court's analysis in *Bryan* and *Cabazon* was very different from a child dependency proceeding. In both those cases, the broad language about "private legal disputes" and "private civil litigation" was made in the context of an attempt to categorize a state's authority to regulate taxation and gambling. The taxation and gambling statutes both regulate the conduct of the public at large. They do not address the rights or status of private individuals. And, in the case of taxation, the Court was particularly sensitive to precedent barring states from taxing reservation Indians with-

out express congressional approval.[30] In contrast, California's child dependency proceedings focus, not on public activities, but on the status of individual Indian parents and children.

At the heart of the dependency proceedings is a dispute about the status of the child, a private individual; the simple fact that the state steps in as a party does not transform what is an adjudicatory proceeding involving private parties into a regulatory proceeding.[31] In short, child dependency proceedings are more analogous to the "private legal disputes" that

---

[30]The Supreme Court in *Bryan* noted that prior decisions of the Court firmly established that without congressional authorization, the states were generally barred from imposing taxes on reservation Indians. 426 U.S. at 376-77. The Court was particularly concerned with Congress's silence on any intention to confer taxing authority over Indian country through the civil component of Public Law 280:

> Of special significance for our purposes, however, is the total absence of mention or discussion regarding a congressional intent to confer upon the States an authority to tax Indians or Indian property on reservations. . . . This omission has significance in the application of the canon of construction applicable to statutes affecting Indian immunities, as some mention would normally be expected if such a sweeping change in the status of tribal government and reservation Indians had been contemplated by Congress.

*Id.* at 381.

[31]California and Minnesota treat suits brought by the state to collect child support from a parent as equivalent to private civil litigation under Public Law 280 jurisdiction. *See County of Inyo v. Jeff*, 227 Cal. App. 3d 487, 494 (Cal. Ct. App. 1991) ("While Public Law 280 is structured in terms of private parties, we believe that the test is one of substance rather than form . . . [T]he mere fact that the state is a party does not in and of itself disqualify [the county]. The action of Inyo can be considered as private in substance."); *Becker County Welfare Dep't v. Bellcourt*, 453 N.W.2d 543, 544 (Minn. Ct. App. 1990) (same). *But see State ex rel. Dep't of Human Res. v. Whitebreast*, 409 N.W.2d 460, 463-64 (Iowa 1987) (rejecting the state's contention that its petition filed "as next friend" transformed its public, regulatory duty into a private civil cause of action under Public Law 280).

fall under a state's Public Law 280 jurisdiction than to the regulatory regimes at issue in *Bryan* and *Cabazon*.

A footnote in *Bryan* underscores that California's child dependency law is different from the taxation laws considered in that case and that it should not be considered "regulatory" in nature. In *Bryan*, the Supreme Court recognized commentary stating that laws having to do with status were the types of laws that Congress envisioned would fall within a state's civil Public Law 280 jurisdiction:

> A fair reading of these two clauses suggests that Congress never intended 'civil laws' to mean the entire array of state noncriminal laws, but rather that Congress intended 'civil laws' to mean those laws which have to do with private rights and *status*. Therefore, 'civil laws . . . of general application to private persons or private property' would include the laws of contract, tort, marriage, divorce, *insanity*, descent, etc., but would not include laws declaring or implementing the states' sovereign powers, such as the power to tax, grant franchises, etc. These are not within the fair meaning of 'private' laws.

426 U.S. at 384 n.10 (emphasis added) (quoting Daniel H. Israel & Thomas L. Smithson, *Indian Taxation, Tribal Sovereignty and Economic Development*, 49 N.D. L. Rev. 267, 296 (1973)). While we do not view the Supreme Court's footnote as dispositive, we observe that the Court recognized "status" laws generally, and "insanity" laws particularly, as different from regulatory laws.

In a similar vein, the Wisconsin Supreme Court has categorized statutes involving status determinations as falling within Public Law 280's civil jurisdiction. That court held that a state civil statute permitting the state to involuntarily commit sexually violent persons applied to Indian country through either the state's Public Law 280 criminal jurisdiction or

through the state's Public Law 280 civil jurisdiction. *In re Burgess*, 665 N.W.2d 124, 132 (Wis. 2003). The Court referenced *Bryan*'s "insanity" language to bolster its alternative civil analysis:

> In addition, even if [Wisconsin's involuntary civil commitment statute] is strictly construed as a "civil" law in its entirety, it is civil/adjudicatory rather than civil/regulatory, and therefore falls within PL-280's grant of civil jurisdiction to the State. . . .
>
> In this case, the adjudication of Burgess's mental health is a status determination, which is more similar to adjudications like those involving insanity, rather than regulations such as the power to tax.

*Id.* at 132-33. Even though the Wisconsin Attorney General's 1981 opinion concluded that the state would not enforce its involuntary child dependency law in Indian country because the laws were "regulatory" in nature under *Bryan*, 70 Op. Att'y Gen. Wis. 237 (1981), 1981 Wisc. AG LEXIS 7, *7, 18, 19-20, the state supreme court decision, which is controlling law in Wisconsin, recognized that a status determination is different than a regulatory regime for civil jurisdictional purposes under Public Law 280.

**[14]** The distinction the Wisconsin Supreme Court drew between state adjudicatory jurisdiction and state regulatory jurisdiction is not without significant textual and historical support. As referenced in William Canby's *American Indian Law Nutshell*:

> The civil grant is one of power over "civil causes of action." This language would appear to mean that the state simply acquired adjudicatory jurisdiction— the power to decide cases—not the entire power to legislate and regulate in Indian country . . . .

> The Supreme Court [in *Bryan*] concluded that the primary purpose of the civil provisions of Public Law 280 was to provide a state forum for the resolution of disputes. Viewed in that light, the provision that the civil laws of the state should have effect in Indian country simply 'authorizes application by the state courts of their rules of decision to decide such disputes.'
>
> The effect of the Court's decision is to confine the civil grant of Public Law 280 to adjudicatory jurisdiction only.

William C. Canby, Jr., *American Indian Law in a Nutshell* 241-42 (4th ed. 2004). That California's dependency law determines children's status is compelling evidence that it is adjudicatory, not regulatory.

Our conclusion does not rest solely on an abstract analysis of Public Law 280. One difficulty with applying *Bryan* and *Cabazon* in a vacuum is that, in those cases, the Court was forced to interpret Public Law 280 as a stand-alone statute without context and with virtually no legislative history. We face a different situation. Here, Public Law 280 is embedded within ICWA, a comprehensive statute with considerable legislative history and with a singular focus—child custody proceedings involving Indian children. Significantly, Public Law 280 must be interpreted as part and parcel of ICWA, the statute into which it is incorporated. Thus, we turn now to an analysis of the text, structure, history, and backdrop of ICWA.

Whereas the civil component of Public Law 280 was enacted with a "virtual absence of expression of congressional policy or intent," *Bryan*, 426 U.S. at 381, in ICWA Congress provided considerable structure, content, and intent. The text and structure of ICWA, coupled with the backdrop against which ICWA was enacted, persuade us that Congress intended Public Law 280 states to exercise jurisdiction over

child dependency proceedings and did not intend to differentiate between voluntary and involuntary proceedings for the purposes of Public Law 280.

**[15]** ICWA references Public Law 280 in two places, both of which indicate that Congress intended Public Law 280 states to have jurisdiction over dependency proceedings in Indian country. First, while § 1911(a) gives tribes in most states exclusive jurisdiction "over any child custody proceeding involving an Indian child, who resides or is domiciled within the reservation of such tribe," Congress limited this tribal jurisdiction "where such jurisdiction is otherwise vested in the State by existing Federal law." In other words, tribes do not have exclusive jurisdiction over child custody proceedings in Public Law 280 states.

**[16]** Second, Congress expressly incorporated Public Law 280 in § 1918(a):

> Any Indian tribe which became subject to State jurisdiction pursuant to the provisions of the Act of August 15, 1953 (67 Stat. 588), as amended by Title IV of the Act of April 11, 1968 (82 Stat. 73, 78) [Public Law 280], or pursuant to any other Federal law, may reassume jurisdiction over child custody proceedings. Before any Indian tribe may reassume jurisdiction over Indian child custody proceedings, such tribe shall present to the Secretary for approval a petition to reassume such jurisdiction which includes a suitable plan to exercise such jurisdiction.

Through use of the term "reassume," Congress manifested its awareness that Public Law 280 states would continue to exercise jurisdiction over child custody proceedings, both voluntary and involuntary. In § 1918, Congress provided tribes in Public Law 280 states the opportunity to obtain exclusive jurisdiction by following a detailed procedure. *See* 25 U.S.C. §§ 1918(a), (b); 25 C.F.R. § 13.12. Absent an attempt to fol-

low that protocol, however, Public Law 280 states may exercise jurisdiction over child custody proceedings.

Section 1918(a) would make little sense unless § 1911(a) permits Public Law 280 states to exercise jurisdiction over child custody proceedings. Section 1918(a) provides a mechanism for the tribes to reassume exclusive jurisdiction. But unless Public Law 280 states have jurisdiction, there is nothing for tribes to reassume under § 1918. It would be illogical to give exclusive jurisdiction back to the tribes under § 1918(a) if such jurisdiction were not part of the exception under § 1911(a).

Mary Doe claims that under ICWA, states have jurisdiction over adoptions and voluntary proceedings, but not over involuntary dependency actions. Mary Doe's efforts to create a distinction between "involuntary" and "voluntary" proceedings in order to put her case outside of California's Public Law 280 jurisdiction are unpersuasive and without statutory support. As an overall proposition, it is important to note that both § 1911(a) and § 1918 reference "child custody proceeding" as a unitary concept and do not separate or distinguish between voluntary and involuntary proceedings.

In addition, "child custody proceeding" is specifically defined by § 1903(1) to include both voluntary and involuntary child custody proceedings:

> (1) "child custody proceeding" shall mean and include—
>
>> (i) "foster care placement" which shall mean any action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon

demand, but where parental rights have not been terminated;

(ii) "termination of parental rights" which shall mean any action resulting in the termination of the parent-child relationship;

(iii) "preadoptive placement" which shall mean the temporary placement of an Indian child in a foster home or institution after the termination of parental rights, but prior to or in lieu of adoptive placement; and

(iv) "adoptive placement" which shall mean the permanent placement of an Indian child for adoption, including any action resulting in a final decree of adoption.

Such term shall not include a placement based upon an act which, if committed by an adult, would be deemed a crime or upon an award, in a divorce proceeding, of custody to one of the parents.

25 U.S.C. § 1903(1).

Although the definition encompasses voluntary adoption, which ultimately would result in "termination of parental rights" and an "adoptive placement," the sequence of the definition is, however, clearly aimed at involuntary proceedings. A "foster care placement" is one "wherein the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated." Following such a placement, parental rights may be terminated. In turn, a child would then be placed in a "preadoption placement" and ultimately, although not necessarily, into a permanent "adoptive placement." The definition of the term "child custody proceeding" definitely encompasses both voluntary

and involuntary proceedings and contemplates state participation in dependency proceedings.

The text of ICWA further underscores that Congress distinguished voluntary from involuntary child custody proceedings when it intended the distinction to be meaningful. For instance, §§ 1912 and 1913 established federal standards that apply in involuntary and voluntary child custody proceedings involving Indian children. Section 1912(a) specifically requires state agencies to give notice to an Indian child's parent or custodian and tribe when an *involuntary* proceeding is pending in state court. 25 U.S.C. § 1912(a) ("In any *involuntary proceeding* in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, . . .") (emphasis added). In addition, § 1913 establishes parental rights in *voluntary* child custody proceedings involving Indian children. 25 U.S.C. § 1913 (entitled "Parental rights; *voluntary* termination) (emphasis added); 25 U.S.C. § 1913(c) (in any *voluntary* proceeding for termination of parental rights, a parent may withdraw consent). Congress made no such distinction between involuntary and voluntary child custody proceedings when it employed its general reference to "child custody proceedings" in §§ 1911(a) and 1918(a).

The maxim that the various provisions of a statute are affected by other parts of the statutory scheme and that "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132-33 (2000) (internal quotations and citations omitted), is particularly apt here. When the term "child custody proceedings" is used as it is defined in § 1903 without modification, it refers to child custody proceedings generally, both voluntary and involuntary. Only §§ 1912 and 1913 make a distinction; when Congress wanted to refer to either voluntary or involuntary

proceedings specifically, it so stated. Absent that delineation, the statute does not differentiate between voluntary and involuntary proceedings. *See* §§ 1911(a) and 1918(a).

This understanding of ICWA is also reflected in the regulations promulgated by the Bureau of Indian Affairs following ICWA's enactment. The regulations require tribes attempting to reassume jurisdiction over child custody proceedings pursuant to § 1918 to show the availability of child care services. 25 C.F.R. § 13.12(5). In particular, the child care services were deemed necessary in cases where a "tribal court finds [a child] must be removed from parental custody," *id.*, which confirms that the Bureau of Indian Affairs anticipated tribal reassumption of jurisdiction over involuntary proceedings where Public Law 280 states had assumed jurisdiction.[32]

[17] In short, the explicit references to Public Law 280 in ICWA, ICWA's clear definition of child custody proceedings, and the statutory structure of ICWA demonstrate that Con-

---

[32]While Mary Doe points out that the same regulations noted that the jurisdictional status of child custody proceedings was not clear in the late 1970s, this statement in the regulations was limited to the debate over whether Public Law 280 states have exclusive or concurrent jurisdiction over child custody proceedings:

> On some reservations there are disputes concerning whether certain federal statutes have subjected Indian child custody proceedings to state jurisdiction or whether any such jurisdiction conferred on a state is exclusive of tribal jurisdiction. Tribes located on those reservations may wish to exercise exclusive jurisdiction or other jurisdiction currently exercised by the state without the necessity of engaging in protracted litigation. The procedures in this part also permit such tribes to secure unquestioned exclusive, concurrent or partial jurisdiction over Indian child custody matters without relinquishing their claim that no Federal statute had ever deprived them of that jurisdiction.

25 C.F.R. § 13.1(b). This question was resolved by our decision in *Native Village of Venetie I*, which held that Public Law 280 states have only concurrent jurisdiction with the tribes over child custody proceedings involving Indian children. 944 F.2d at 559-62.

gress intended Public Law 280 states to have jurisdiction over Indian child dependency proceedings unless tribes availed themselves of § 1918 in order to obtain exclusive jurisdiction. The effort to impose a dividing line between voluntary and involuntary finds no support in the statute.

The legal landscape that existed when Congress passed ICWA bolsters the conclusion that Public Law 280 states have jurisdiction over child dependency proceedings. When Congress enacted ICWA, states already were exercising their Public Law 280 jurisdiction over child dependency proceedings, a fact we presume Congress knew. *E.g.*, *United States v. Gonzalez-Mendez*, 150 F.3d 1058, 1061 (9th Cir. 1998) ("We presume that Congress enacts statutes with full knowledge of the existing law."). Therefore, it cannot go unnoticed that Congress considered ICWA against the backdrop of mandatory Public Law 280 states like California[33] and non-mandatory states like Washington and Idaho that had specifically asserted Public Law 280 jurisdiction over child dependency proceedings prior to the passage of ICWA.[34] Had Congress wanted to divest Public Law 280 states of this jurisdiction, surely it would have done so on the face of ICWA.

---

[33]As a mandatory Public Law 280 state, California did not need specific state legislation to take jurisdiction over Public Law 280 subjects, including child dependency.

[34]Wash. Rev. Code § 37.12.010 (1963); Idaho Code § 67-5101 (1963). These statutes did not indicate whether the states thought the criminal or civil component of Public Law 280 provided each state with jurisdiction over involuntary child dependency proceedings. Recently, an Idaho appeals court asserted in dictum that Idaho's child dependency law was prohibitory in nature, and therefore, fell within the state's criminal Public Law 280 jurisdiction. *State v. Marek*, 777 P.2d 1253, 1255 (Idaho Ct. App. 1989) ("Idaho does not merely "regulate" — rather, it prohibits and seeks to eliminate — injury to children. Indeed, the same can be said of the Child Protective Act and the Parent-Child Relationship Termination Act. These statutes do not simply 'regulate' the abuse, neglect or abandonment of children; rather, they seek to prevent and to ameliorate the tragic effects of such conduct.").

The legislative history of ICWA supports the view that Congress intended Public Law 280 states to retain jurisdiction over all child custody proceedings as defined in ICWA. In fact, the focus of Congress and the Executive Branch on the ability of tribes in Public Law 280 states to reassume exclusive jurisdiction over child custody proceedings comports with our conclusion that both branches were particularly concerned with the tribes' ability to handle resource-intensive child custody proceedings. In passing ICWA, Congress recognized that Public Law 280 states should retain, at least initially, jurisdiction over child dependency proceedings until the tribes had the capability to reassume exclusive jurisdiction.

As discussed in § III(B), *supra*, the carve out of Public Law 280 states from ICWA's exclusive tribal jurisdiction was a conscious undertaking on the part of Congress. Indeed, after the Executive Branch brought to the attention of Congress that failure to exclude Public Law 280 states from § 1911(a) would obliterate existing state-court jurisdiction, Congress was quick to respond—both with a letter to the Department of Justice[35] and with amendment of the draft bill.

It is also important to note that throughout the congressional discussions of ICWA, state-initiated dependency proceedings were a focus of the discussion. The conference report that accompanied the passage of ICWA demonstrates Congress's focus on abuses in involuntary child custody proceedings involving Indian children. After summing up the statistical evidence that Indian children were far more likely to be removed from their families and placed in foster homes than non-Indian children, the report stated "It is clear then that the Indian child welfare crisis is of massive proportions and

---

[35]Morris Udall, Chairman of the Interior and Insular Affairs Committee, advised the Department of Justice that the Committee had, in fact, "amended the bill to meet some of the Department's objections." 124 Cong. Rec. H38103 (daily ed. Oct. 14, 1978) (letter of Rep. Udall).

that Indian families face vastly greater risks of involuntary separation than are typical of our society as a whole." H.R. Rep. No. 95-1386, at 9 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7530, 7532. The report went on to note that "[i]n judging the fitness of a particular family, many social workers, ignorant of Indian cultural values and social norms, make decisions that are wholly inappropriate in the context of Indian family life and so they frequently discover neglect or abandonment where none exists." H.R. Rep. No. 95-1386, at 10, *reprinted in* 1978 U.S.C.C.A.N. 7530, 7532.

While it is true that Congress also expressed concern with voluntary adoptions both by incorporating voluntary proceedings as part of ICWA and noting voluntary proceedings in the legislative history, the legislative history demonstrates Congress's strong interest in curbing the abuses of state agencies and courts in involuntary proceedings. To conclude that Congress, when it amended § 1911(a) to exclude tribes in Public Law 280 states from exercising exclusive jurisdiction, meant only to refer to voluntary proceedings is thus unreasonable. If Congress intended to differentiate between voluntary and involuntary proceedings in the context of the Public Law 280 proviso in § 1911(a), then Congress would have done so explicitly rather than referring only to "child custody proceedings" generally before inserting the "existing Federal law" proviso. In drafting the definition of "child custody proceedings" to include involuntary proceedings and in structuring the legislation so that tribes in Public Law 280 states could reassume exclusive jurisdiction over these proceedings, Congress recognized that dependency proceedings fell within the Public Law 280 carve out.

The case law cited in the report accompanying the passage of ICWA also supports this understanding. The report cites three cases involving non-Public Law 280 states. In each instance, the court held that tribes had exclusive jurisdiction. But the cases all suggest that if Public Law 280 had been applicable, the state would have had jurisdiction. H.R. Rep.

No. 95-1386, at 21 (July 24, 1978), *reprinted in* 1978 U.S.C.C.A.N. 7530, 7544 (citing *Wisconsin Potowatomies v. Houston*, 393 F. Supp. 719 (W.D. Mich. 1973); *Wakefield v. Little Light*, 347 A.2d 228 (Md. 1975); *Matter of Adoption of Buehl, Duckhead v. Anderson*, 555 P.2d 1334 (Wash. 1976)).[36]

The citation to *Duckhead* is particularly instructive because *Duckhead* references *Comenout v. Burdman*, 525 P.2d 217 (Wash. 1974). *Duckhead*, 555 P.2d at 1338-39. In *Comenout*, the Washington Supreme Court held that Washington courts have jurisdiction pursuant to Public Law 280 to terminate the parental rights of Indians residing on reservations within the State of Washington through enforcement of the state's involuntary child dependency law. 525 P.2d at 222.

Mary Doe urges us to apply the Indian canon of construction to resolve the dispute in her favor. *See Ala. Pac. Fisheries Co. v. United States*, 248 U.S. 78, 89 (1918) (ambiguous provisions in a statute passed for the benefit of tribes and their members are interpreted in favor of the Indians). Although we have applied the Indian canons to resolve whether state speeding laws are criminal or regulatory under Public Law 280, that case involved Public Law 280 as a standalone statute and not in connection with ICWA's exception. *See Confederated Tribes of Colville*, 938 F.2d at 149.

The sovereignty considerations that have led courts to apply the canon in interpreting Public Law 280 are not present here because Congress already weighed those considerations in formulating ICWA. There is little doubt that concern for tribal sovereignty and tribal control over Indian children led

---

[36]Although the Washington Supreme Court decided *Duckhead* and Washington is a non-mandatory Public Law 280 state, the case involved a tribe located in Montana, a state that had not assumed Public Law 280 jurisdiction over the Montana tribe involved in the case. *Duckhead*, 555 P.2d at 657-58 & n.6. The court emphasized that if Washington's Public Law 280 jurisdiction had applied, the state would have had jurisdiction to terminate the parental rights of Indians. *Id.* at 657.

to ICWA's adoption. *See* 25 U.S.C. § 1901(3) (Indian Child Welfare Act Congressional Findings — "there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children"). After *Bryan*, the carve out from Public Law 280 of regulatory jurisdiction was clear and the scope of Public Law 280 civil jurisdiction was clarified. In the face of this decision, Congress was unambiguous in its effort to exempt Public Law 280 states from ICWA's exclusive jurisdiction and, in doing so, to include all child custody proceedings, both voluntary and involuntary.

[18] But Congress was not unmindful of bridging the sovereignty gap for tribes in Public Law 280 states. With the goal of making tribal sovereignty paramount, Congress established a scheme by which tribes in Public Law 280 states, without the cooperation of state governments, could petition the Secretary of Interior for reassumption of exclusive jurisdiction over child custody proceedings through § 1918. Section 1918 recognized the sovereignty concerns of tribes by permitting Public Law 280 tribes to reassert their sovereign, exclusive authority over child custody proceedings involving children domiciled on the reservation. Given the lack of ambiguity in ICWA and explicit congressional recognition of Indian sovereignty in ICWA, including the reassumption provisions, the Indian canon of construction does not come into play.

Mary Doe's tribe, the Elem Indian Colony, has never petitioned for reassumption of jurisdiction over child custody proceedings. We decline to use the Indian canon of construction to disrupt a congressional scheme that provided a specific process through which tribes in Public Law 280 states could protect their sovereign interests in the future of Indian children. Although our decision does not provide relief to Mary Doe, nothing prevents Mary Doe's tribe from submitting a petition to reassume jurisdiction[37] and nothing prevents Con-

---

[37]Section 1918(d) states that an "[a]ssumption of jurisdiction under this section shall not affect any action or proceeding over which a court has already assumed jurisdiction . . ."

gress from amending ICWA's statutory scheme to recognize the tribal sovereignty interests through a method other than § 1918's reassumption provisions. In a policy area so fraught with risk to the interests of Indian children and tribes, we do not think the court should substitute its judgment for that of Congress where Congress explicitly provided tribes an opportunity to assert their sovereignty over child custody proceedings.

Finally, we turn to a discussion of California's practice of asserting concurrent jurisdiction under Public Law 280 over dependency proceedings involving Indian children. The practice is best described by a benchguide for California judges prepared by the Law Offices of California Indian Legal Services. *See generally* Mary J. Risling, *California Judges' Benchguide: The Indian Child Welfare Act* (2000), *available at* http://www.calindian.org/icwa.htm. Because the excerpts are illuminating, we quote at length.

> Under its definition of "child custody proceeding", the [ICWA] specifies the types of custody cases to which it applies and the types of custody cases to which it does not apply. The focus is not on what a proceeding is called, or whether it is a private action or an action brought by a public agency, but on whether the proceeding meets a definition set forth in the Act. (25 U.S.C. 1903(1).) The Act covers *any* temporary placement where the child need not be returned upon demand, and includes placement in a foster home or institution or the home of a guardian or conservator. The Act also covers *any* proceeding resulting in adoption or termination of parental rights. This would generally not include juvenile, family court and probate guardianship actions.

*Benchguide* at 1 (emphasis original).

\*\*\*

While California tribes do not yet have primary jurisdiction over custody proceedings, it is important to bear in mind that the Indian child has an interest in his or her tribe that Congress has sought to protect. . . .

Non-exclusive jurisdiction can also arise where a tribe's authority over civil matters has been partially divested by the federal government. Although tribes generally retain exclusive jurisdiction over their internal affairs, in some states, Congress delegated to the states partial jurisdiction over Indian reservations within the states. 28 U.S.C. § 1360. These states are commonly called "P.L. 280 states", and the tribes affected by the statute are called "P.L. 280 tribes". In these states, even if a child is domiciled or resides on the reservation, the state may acquire valid initial jurisdiction. 25 U.S.C. § 1911(a). California is one of these states. 25 U.S.C. § 1360(a). *Tribes from California and other P.L. 280 states may not exercise exclusive jurisdiction over an Indian child custody proceeding under the ICWA, unless they have reassumed jurisdiction under the Act. Where a tribe has reassumed jurisdiction, and an Indian child residing or domiciled within that tribe's reservation is removed by state authorities, California law requires notice to the tribe no later than the next business day, and transfer of the proceedings to tribal court within 24 hours of receipt of a written notice from the tribe that the child is an Indian. Welf. & Inst. Code § 305.5.*

*Benchguide* at 64-65 (emphasis added).

In addition, California's dependency statute suggests that California will transfer a child dependency proceeding to a tribe only if the tribe has reassumed exclusive jurisdiction under § 1918:

**Removal of Indian child from custody of parents
by state or local authority; notice to tribe**

(a) Where an Indian child, who resides or is domi-
ciled within a reservation of an Indian tribe that has
reassumed exclusive jurisdiction over Indian child
custody proceedings pursuant to Section 1918 of
Title 25 of the United States Code, has been
removed by a state or local authority from the cus-
tody of his or her parents or Indian custodian, the
state or local authority shall provide notice of the
removal to the tribe no later than the next working
day following the removal and shall provide all rele-
vant documentation to the tribe regarding the
removal and the child's identity. If the tribe deter-
mines that the child is an Indian child, the state or
local authority shall transfer the child custody pro-
ceeding to the tribe within 24 hours after receipt of
written notice from the tribe of that determination.

(b) As used in this section, the terms "Indian child"
and "Indian child custody proceedings" shall be
defined as provided in the federal Indian Child Wel-
fare Act (25 U.S.C. Sec. 1901 et seq.).

Cal. Welf. & Inst. Code § 305.5.

It is also significant that prior to amendment in 2005, Rule
1439(c)(1) of the California Rules of Court stated: "If the
Indian child resides or is domiciled on an Indian reservation
that exercises exclusive jurisdiction under the Act over child
custody proceedings, the petition under section 300 must be
dismissed. At present, no California tribe is authorized under
the Act to exercise exclusive jurisdiction." The new rule con-
tains the same substantive provision suggesting that a state
court will not transfer a dependency proceeding under
§ 1911(a) unless the tribe has reassumed jurisdiction: "If the
Indian child resides or is domiciled on an Indian reservation

that exercises exclusive jurisdiction under the act over child custody proceedings, the petition under section 300 must be dismissed." Cal. Ct. R. § 1439(c)(1).

Consistent with ICWA, California, a mandatory Public Law 280 state, has been exercising at least concurrent jurisdiction over dependency proceedings involving Indian children. With the drop of a hat, Mary Doe would have us undo this statutory and historical framework and immediately vest exclusive jurisdiction in the tribes. Such a result surely would eviscerate the unambiguous Public Law 280 exception in ICWA. From an ultimate perspective of public policy and in furtherance of the goal of tribal sovereignty over the destiny of Indian children, a transition from Public Law 280 jurisdiction to tribal jurisdiction in child custody proceedings may well be appropriate. But we believe this is a judgment for Congress to make, not the courts.

**AFFIRMED.**